UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| FRANKIE N. WALKER, | ) |
| Plaintiff, | ) |
| v. | ) 13-CV-3079 |
| SHAN JUMPER, et al., | ) |
| Defendants. | ) |

## OPINION

Plaintiff proceeds pro se from his detention in the Rushville Treatment and Detention Center pursuant to the Illinois Sexually Violent Persons Act. This case proceeds on claims that Plaintiff has been denied treatment for his serious mental disorder because his progress has been conditioned on taking polygraph tests and completing programs that are not targeted to treating his mental disorder. Plaintiff maintains that these treatment requirements are in reality unnecessary and a delay tactic. Plaintiff has also tried to challenge the results of a March 2010 polygraph and the procedures employed to administer that polygraph, but that claim has been dismissed as barred by the statute of limitations. (11/18/13 Order.)

Defendants move for summary judgment which is granted. In short, Plaintiff's failure to progress in treatment is due to Plaintiff, not to Defendants or to the treatment program offered.

**Facts**

The treatment program at Rushville is divided into five phases, with each phase having different levels of programming. (Undisp. Facts 13, 16.) Plaintiff was admitted to Rushville in 2007. He completed the first treatment phase in the beginning of 2010 and then began Phase II (accepting responsibility). (Undisp. Fact 36, 37.) In the disclosure level of Phase II, residents:

> Work on relapse prevention, talk about their sexual histories, and describe their sexual offenses. They work on Phase II goals, which include: taking responsibility for their sexual offense histories, learning to not blame others for their past offenses, being open and honest about their pasts, learning about thinking errors that lead to sexual behavior and offenses, and writing and speaking about their life stories.

(Undisp. Fact 17.) In phase II, residents are given a polygraph test, Defendants assert to "assess [the residents'] level of honesty." (Proposed Undisp. Fact 18.) Plaintiff contends that polygraphs are unreliable.

As part of the phase II program, Plaintiff took a polygraph test in December 2009 and another polygraph test in March 2, 2010. Plaintiff passed the first polygraph test, which dealt with the use of force, restraints, threats of harm, use of weapons, and striking victims. (Pl.'s Declaration para. 8., d/e 114.) The second test asked questions about unreported sexual offenses. Plaintiff was found to be "not truthful" when he answered "no" to the following questions on the second test:

1) Have you ever sexually offended against a male?

2) Besides what you told your group, do you have any victims under the age of 12?

3) Have you deliberately withheld anything from your group about your sexual offense history?

(3/2/2010 Examination Results, d/e 106, p. 68.) The post-test interview portion of the results states that Plaintiff had been confused as to the definitions provided to him, in particular regarding whether he had sexually abused males. Plaintiff's understanding of the term "sexually offended" meant a criminal sexual offense, but the definition given to him during the polygraph exam apparently included manipulation, regardless of whether the

manipulation qualified as a crime. Id. p. 69. Plaintiff asserts that his treatment group in March 2010 was run by an intern and that "clinician and therapists . . . create their own definitions of 'sex offenses' and coerce and force admissions and adherence to these unorthodox definitions." (Pl.'s Declaration para 2, d/e 114.) Plaintiff believes that the second polygraph test was given to sabotage him and to justify his continued confinement, but this assertion is not supported by any evidence. (Pl.'s Resp. para. 40, d/e 113.) The 2010 polygraph has not been admitted in Plaintiff's civil commitment proceedings. (Pl.'s Dep. 63-64.)

Ever since the 2010 polygraph test, Plaintiff has focused his efforts on expunging that test. He voluntarily withdrew from treatment in June 2010 because he felt he was being badgered about the failed polygraph test rather than being allowed to work on treatment. (Pl.'s Resp. para. 45, d/e 113.) His voluntary withdrawal from treatment continued until April 2013, when he expressed an interest in resuming treatment. However, he then refused to initial the sections of the consent form about uncharged offenses and also stated that he would not be disclosing his offense history because he did not want to waive any rights relating to his

litigation over the 2010 polygraph results. (Defs.' Undisp. Facts 47-49.)

Plaintiff argues that requiring him to sign these parts of the consent form violated his Fifth Amendment right against self-incrimination. This is a new claim that is not part of this case. In any event, Plaintiff admitted that he had already disclosed all of his sexual history and nothing in the record suggests that he was charged criminally based on those disclosures. *See, e.g.,* McKune v. Lile, 536 U.S. at 33 (conditioning prison sexual abuse treatment program on inmate's acceptance of responsibility for crimes did not violate Fifth Amendment because of voluntary nature of participation); Allison, 332 F.3d 1076 (no Fifth Amendment violation for sexually dangerous civil detainees who were required to admit crimes as part of voluntary treatment which offered opportunity for release).

On November 14, 2013, Plaintiff did sign a consent-to-treatment form, though he objected to Defendant Louck's statement that Plaintiff may be required to take another polygraph. Ten days later, Defendant Louck informed Plaintiff that Plaintiff would need to complete a sexual history polygraph. Plaintiff objected,

"acknowledg[ing] that his priority was to fight the injustices that he perceived from the March 2010 polygraph[,]" and that the "challenge to the March 2010 polygraph outweighed his commitment to treatment." (Undisp. Fact 55.) Plaintiff confirmed in the following months that he would not take another polygraph. (Undisp. Facts 56-58.)

In June of 2014, Plaintiff was referred to a group called the Power to Change, which was explained to him as a prerequisite to participating in phase II. (Undisp. Fact 60.) Plaintiff objected, but he continued with treatment for the rest of 2014, including the Power to Change group. (Undisp. Fact 62.) During this time, he and his therapists reached an understanding about how Plaintiff could disclose his behavior in the Illinois Department of Corrections without causing problems with a polygraph. (Undisp. Fact 63.)

In January 2015, Plaintiff moved from the Power to Change group to the disclosure phase in Phase II. Plaintiff signed a master treatment plan which included successfully passing the polygraph examination. (Undisp. Fact 66.) Plaintiff continued with treatment at the disclosure level of Phase II, but in April 2015 stated that he wanted to hold off on the polygraph. Plaintiff continued to oppose

taking a polygraph through September 2015. (Undisp. Facts 69-72.) Plaintiff's therapist "counseled him that his rigidity and pride may be interfering with his ability to accept the treatment process." (Undisp. Fact 72.)

In October 2015, Plaintiff was again told that he needed to pass a polygraph to complete Phase II. He was told that a new polygrapher could administer the test the next month and that Plaintiff could then progress to Phase III if he passed the polygraph. Plaintiff refused, stating, "I'm not concerned about moving forward in treatment, I'm concerned about catching a culprit." (Undisp. Fact 73.) Plaintiff was given four weeks to show progress on taking the polygraph, but he continued to refuse. (Undisp. Facts 73-74.)

In November 2015, Plaintiff was moved back to the Power to Change group because Plaintiff's treatment team determined he was not ready to take the polygraph and because of "his related distortions and resistance to accepting responsibility and feedback." (Undisp. Fact 77.) The Power to Change group addresses behaviors that interfere with treatment. (Pl. Dep. 38.)

## Discussion

Plaintiff continues to try to make this case about challenging the 2010 polygraph procedure and results. The Court remains of the opinion that such a challenge is barred by the statute of limitations. (11/18/13 Order; 1/31/2014 Order.) But, in any event, Plaintiff states no federal claim arising from the 2010 polygraph, even if the challenge is timely. A polygraph test which defines the term "sexually offended" to include non-criminal manipulation into sexual activity is not a constitutional violation. Plaintiff's decision to withdraw from treatment because of his disagreement with that definition does not give rise to a constitutional violation.

Further, requiring Plaintiff to take polygraph tests as part of his treatment is constitutional. Plaintiff assails the reliability and use of polygraphs, but the United States Supreme Court and the Seventh Circuit have held that polygraphs may be an appropriate part of sex offender treatment. McKune v. Lile, 536 U.S. 24 (2017)(upholding sexual abuse treatment program which required sexual history "regardless of whether such activities constitute uncharged criminal offenses" and a "polygraph examination . . .

used to verify the accuracy and completeness of the offender's sexual history"); Allison v. Snyder, 332 F.3d 1076 (7th Cir. 2003)(upholding treatment of sexually dangerous persons, which included group therapy and polygraphs "to check whether participants in this program are being candid."); *see also* U.S. v. Warren, 843 F.3d 275, 285 (7th Cir. 2016)(regardless of debate over polygraph's usefulness and reliability, "polygraph conditions have been upheld by every circuit where the circumstances warranted it" for supervised release conditions); Ambrose v. Godinez, 5110 Fed.Appx. 470 (7th Cir. 2013)(not published in Fed. Rep.)(sexually dangerous person's claim properly dismissed where claim was essentially that he wanted "treatment without accepting responsibility"); U.S. v. Sines, 303 F.3d 793 (7th Cir. 2002)(upholding supervised release condition requiring participation in sex offender treatment program, which included "periodic progress checks via polygraph testing"); Hargett v. Adams, 2005 WL 399300 **11, 19 (N.D. Ill. 2005)(not published in Federal Reporter)(acknowledging debate on reliability and usefulness of polygraph technique for phase II treatment for sexually violent persons, but concluding that the technique was "well within the

bounds of professional judgment."); Walker v. Watters, 348 F.Supp.2d 1031 (W.D. Wis. 2004)(requiring polygraph in treatment program for sex offender did not violate due process); Laxton v. Watters, 348 F.Supp.2d 1024 (W.D. Wis. 2004)(same). Imposing the polygraph requirement as part of Plaintiff's treatment falls within the acceptable bounds of professional judgment. *See* Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2009)(Deliberate indifference arises "if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.")

The 2015 decision to move Plaintiff out of phase II and into the Power to Change group when Plaintiff refused to take a polygraph test was also within the acceptable bounds of professional judgment. Plaintiff admitted that he would not move beyond his complaints about the 2010 polygraph and would not take another polygraph until the 2010 polygraph debate was resolved to his satisfaction. The Power to Change group's purpose is to work on treatment barriers, such as Plaintiff's inability to move beyond the 2010 polygraph. Plaintiff argues that he should be allowed to finish

other aspects of the phase II treatment, but Plaintiff does not have a constitutional right to dictate his treatment.

**IT IS ORDERED:**

1. Defendants' motion for summary judgment is granted (d/e 103).

2. Plaintiff's motion for status is denied as moot (d/e 116).

3. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs. All deadlines and settings on the Court's calendar are vacated.

4. If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis should identify the issues Plaintiff will present on appeal. See Fed. R. App. P. 24(a)(1)(c).

ENTERED: July 11, 2017

FOR THE COURT:

                              **s/Sue E. Myerscough**
                              SUE E. MYERSCOUGH
                      UNITED STATES DISTRICT JUDGE